BAKER, Judge,*
with whom ERDMANN, Chief Judge, joins (dissenting):
Principle is hardest to hold in the face of countervailing virtue. For a judge that moment may arrive when knowing what is just, one must also consider what is fair. This is a ease about whether or not the military justice system was fair, not whether it was -just.

INTRODUCTION

Appellant raises fifty-nine issues on appeal. This Court heard oral argument on five issues. However, in my view, there is but one pivotal question: Did defense counsel provide ineffective assistance of counsel in the manner in which they presented Appellant’s sentence mitigation case?
To understate, defense counsel had a hard case. Their task was made harder by the absence of guidelines in the military for handling death penalty cases and a requirement to provide counsel “learned in the law applicable to capital cases” in death penalty cases. That meant that defense counsel, appointed from the ranks of judge advocates, were on their own, without clear guidance or expert assistance on the criteria against which to measure the effective assistance of counsel in this death penalty case.
The military has guidelines on the length of hah' and mustaches.[1] It has guidelines on how much fat is permitted on a cut of meat served in the mess hall,[2] and it has guidelines on the placement of the necktie in relation to one’s belt,[3] but it does not have guidelines on how to provide effective assistance of counsel in a death penalty casé. This seems to expose counsel unnecessarily to allegations of ineffective assistance of counsel. The absence of counsel “learned in the law applicable to capital cases” who might have helped fill this void compounds the problem.
Guidelines or not, hard case or not, in my view, Appellant’s trial defense counsel were ineffective in two respects. First, and foremost, counsel were ineffective for providing to members Appellant’s 318-page diary without appropriate contextual explanation. The Government earlier introduced three pages of this diary. However, it was defense counsel who introduced the other 310 pages. These pages included a running diatribe against Caucasians and the United States dating back twelve years, and included repeated references to Appellant’s desire to kill American soldiers “for Allah” and for “jihad.”
The defense intended the diary to reflect Appellant’s descent into mental illness. However, the diary was offered without adequate explanation, expert or otherwise. Until closing arguments, members were left on their own to read and interpret the diary’s contents along with the mitigation specialist’s notes and an FBI report. In the words of defense counsels’ expert medical witness: it “was a mistake” to admit the diary into evidence. He “never advised or would have advised trial defense counsel to admit the diary as they did” because, “[t]o a lay person the diary is damning evidence, standing alone, ... and the nature of [Appellantj’s diary contained explosive material.” Appellant’s mitigation specialist stated she “would have never advised introduction of ... [Ap *419 pellant’s] diary without providing context through testimony.” No wonder it was Government trial counsel who referenced the diary throughout his closing argument.
Second, counsel were ineffective for failing to produce a single witness, including any family member, to provide humanizing testimony in favor of a life sentence. The message was clear and unmistakable: not even a family member was prepared to say Appellant’s life was worth sparing.
Finding ineffective assistance, this leaves the question of prejudice under Strickland prong II. See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As the majority suggests, Appellant has a steep cliff to scale. The evidence of guilt was overwhelming, including through defense counsels’ introduction of Appellant’s diary. Moreover, Appellant’s crimes were heinous. Appellant murdered two soldiers and wounded fourteen others. He did so with wanton disregard. He did so on the eve of battle and, in his mind, to aid the enemy. And, he did so with premeditation, as evidenced by the diary. Nonetheless, there are two arguments supporting a finding of prejudice.
First, the members requested an instruction on reconsideration of sentence. That makes this case different from almost every other death penalty case and virtually every other ineffective assistance of counsel case. It indicates that at least one member was open to considering an outcome other than death. In other words, the request for this instruction suggests that at least one juror may have been persuaded to spare Appellant’s life with an effective presentation of mitigation evidence.
Second, the standard for prejudice cannot be: “if there ever was a ease where a military court-martial panel would impose the death penalty, this was it.” United States v. Akbar, 74 M.J. 364, 372 (C.A.A.F.2015). That is the standard adopted by the majority. With a standard like that, if a defendant committed a particularly despicable crime, it would not matter if he received effective assistance of counsel, or for that matter a fair trial, because we could be confident in the outcome. However, the hallmark of American justice is its commitment to procedural justice as well as to substantive justice. How we reach a result can matter as much as what result we reach. That is the essential judicial virtue of a democracy. This case tests that commitment.
Therefore, for the reasons explained below, I respectfully dissent and would remand this case for a new sentence rehearing.
This opinion proceeds in two sections. Section I addresses the applicable standard for ineffective assistance of counsel in death penalty cases. The section highlights the absence of standards and guidelines for defense counsel in death penalty cases in the military and considers the consequences- of such an absence. Section II considers the application of Strickland in this ease. Part A addresses the submission of Appellant’s entire diary into evidence without medical context or explanation and explains why, in this case, such a decision amounted to ineffective assistance of counsel. Part B discusses the failure of counsel to offer mitigating evidence in the form of humanizing testimony to spare Appellant’s life. Finally, Part C addresses prejudice and determines that where; as here, the members asked for a sentence reconsideration instruction, there is concrete rather than speculative evidence that an effective presentation on sentencing might have swayed at least one member to vote for life.

DISCUSSION

I. Standards for Capital Defense Counsel. in the Military
A. Absence of Military Guidelines, Standards, and Norms
Evaluation of defense counsels’ performance starts with the identification of the prevailing standard or professional norm against which to measure counsels’ performance. However, such standard is elusive. There are no guidelines in the military on death penalty defense. The armed services have not adopted the ABA Guidelines for the Appointment and Performance of Defense *420 Counsel in Death Penalty Cases.[4] American Bar Association Guidelines on Appointment of Counsel in Death Penalty Cases, reprinted in 31 Hofstra L.Rev. 913, 1061 (2003) [hereinafter ABA Guidelines ]. And yet, we know that “death is a punishment different from all other sanctions.”[5] It is different in severity; different in finality; and different in what is expected of competent counsel. Guidance is needed.
This Court has “decline[d] to mandate minimum standards based on years of practice or number of cases tried” for military capital defense counsel.[6] The Supreme Court has not mandated minimum qualifications or training either. It is not constitutionally required.
In the absence of military norms, guidelines, and standards, Strickland becomes the standard. In Strickland v. Washington, a capital case, the Supreme Court set forth the familiar .two-part test applicable to claims of ineffective assistance of counsel:
First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This *421 requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. ■ ■
466 U.S. at 687, 104 S.Ct. 2052; see also United States v. Green, 68 M.J. 360, 361 (C.A.A.F.2010). With respect to the first prong, “the defendant must show that counsel’s representation fell below an objective standard of reasonableness,” based on “prevailing professional norms.” Strickland, 466 U.S. at 688, 104 S.Ct. 2052. This now-axiomatic standard, by design, provides little guidance as to what these “prevailing professional norms” are, or where one can find them. Indeed, the Supreme Court stated in Strickland that “[m]ore specific guidelines are not appropriate.” Id; see also Roe v. Flores-Ortega, 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (citing Strickland 466 U.S. at 689, 104 S.Ct. 2052) {Strickland has “rejeet[ed] mechanistic rules governing what counsel must do.”). “Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) (“The Defense Function”), are guides to determining what is reasonable, but they are only guides.” Id; see also Bobby v. Van Hook, 558 U.S. 4, 8-9, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (noting that the ABA Guidelines are not “inexorable commands with which all capital defense counsel ‘must fully comply,’ ” rather, they are “ ‘only guides’ to what reasonableness means, not its definition”) (internal citations omitted).
What, then, are the key elements of the Strickland standard? Objectively reasonable tactical choices based on objectively reasonable investigation informing those choices, both of which are measured by “prevailing professional norms.” Here is the problem. As Strickland itself recognizes, this standard is evolving and changing. Nor is it one that is immediately evident to a practitioner outside the death penalty field. And, even where discernible, prevailing professional civilian norms may not fit with military practice.
Perhaps cognizant of these limitations, the Supreme Court since Strickland has endorsed the adoption of more detailed guidance for capital defense counsel as a non-constitutional matter. See Flores-Ortega, 528 U.S. at 479, 120 S.Ct. 1029; see also Van Hook, 558 U.S. at 8-9, 130 S.Ct. 13. As the Supreme Court has recognized, even though “the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices,” state governments and private organizations “are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented.” Flores-Ortega, 528 U.S. at 479, 120 S.Ct. 1029 (state governments can impose specific rules); Van Hook, 558 U.S. at 9, 130 S.Ct. 13 (“What we [the Supreme Court] have said of state requirements is a fortiori true of standards set. by private organizations.”). For example, a “less categorical use of the [ABA] Guidelines” to evaluate counsel’s performance may be proper to the extent the guidelines “reflect prevailing norms of practice and standard practice and must not be so detailed that they would interfere with the constitutionally protected independence of counsel.” Van Hook, 558 U.S. at 8 n. 1, 130 S.Ct. 13 (citations omitted) (internal quotation marks omitted).
There is therefore no reason not to promulgate standards for capital defense counsel in the military. Guidelines are useful and necessary if the military is going to have a death penalty. Specialized facets of the military justice system make such guidance invaluable.
B. The Utility of Guidelines for Military Capital Defense Counsel
It is self-evident that “[c]ounsel who are ‘learned in the law applicable to capital cases’ are less likely to provide an inadequate or ineffective defense than those ‘not learned’ in the law.” United States v. Murphy, 50 M.J. 4, 9 (C.A.A.F.1998). “[I]nexperienee — even if not a flaw per se — might well lead to inadequate representation.” Id.[7]
*422 First, the military justice system does not have a death penalty qualified bar.[8] In civilian eoui'ts, federal capital defense counsel are required by statute to be “learned in the law applicable to capital cases.” 18 U.S.C. § 3005 (1994). Under 18 U.S.C. § 3005, as amended in 1994 through the Federal Death Penalty Act, a capital defendant is entitled to two counsel, “of whom at least 1 shall be learned in the law applicable to capital cases.” Prior to the 1994 amendment, the statute only required that counsel be “learned in the law”; the 1994 amendment added the phrase “applicable to capital cases.” Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591-3598.[9] At least one federal circuit court has interpreted this to mean that counsel must have significant experience litigating criminal cases to qualify as “learned counsel” under this statute.[10] Significantly, even persons accused of committing terrorist acts against the United States are entitled, “to the greatest extent practicable,” to at least one “counsel who is learned in applicable law relating to capital cases” under the Military Commissions Act. 10 U.S.C. § 949a(b)(2)(C)(ii) (2012).[11] Yet no similar requirement exists for service members accused of a capital crime. As a result, there is no guarantee that any accused service member will receive counsel who have specialized training or experience defending death penalty cases.
Second, there are an insufficient number of capital cases to effectively train a cadre of military counsel to be well versed in capital litigation. For example, there were forty-seven capital prosecutions between 1984 and 2006, with only fifteen of them resulting in a death sentence. See Sullivan, supra note 8, at 17. Moreover, there is little opportunity for counsel to specialize in capital litigation, as counsel are expected to be military law generalists who should be prepared to practice in a number of legal fields, of which only one is criminal law. As the ABA Guidelines acknowledge, “death penalty cases have become so specialized that defense counsel have duties and functions definably different from those of counsel in ordinary criminal cases,” ABA Guidelines, Introduction, 31 Hofstra L.Rev. at 923, yet there is little opportunity to develop relevant experience. In addition, military defense counsel are typically transferred to different duty stations over the course of their careers after serving a three-year tour, reducing the amount of time they can spend on protracted capital litigation. See Sullivan, supra note 8, at 48 (“Given that judge advocates typically stay in a position for no more than three years, it is unlikely that any participant in a capital court-martial will have experience performing his or her duties in a death penalty ease.”). In the context of capital cases, this contributes to uncertainty that counsel “learned in the law applicable to capital cases” will indeed be *423 provided to accused persons at every stage of their case.
In this case, for example, Appellant’s defense counsel had a permanent change of station while they were still representing Appellant. Lieutenant (LTC) Brookhart was reassigned to the 10th Mountain Division. Major (MAJ) Coombs was assigned a new position as senior defense counsel at Fort Eustis and Fort Lee, Virginia. Defense counsel attributed their transfers to Government counsel’s “tampering,” stating in their post-trial affidavit that they “were both shocked that a senior judge advocate would take such action” and believed “it created a very damaging appearance issue with regards to the fairness of the military justice system.” LTC Brookhart, the more experienced of the two attorneys, stated that he was only able to continue working on Appellant’s case because the staff judge advocate, LTC Jim Garrett, “recognized the seriousness of the situation” and “made arrangements for LTC Brookhart to stay at Fort Drum to work as a special projects officer in Administrative Law,” permitting LTC Brookhart to work on Appellant’s case. As defense counsel have noted, such a structure is problematic, not only because of the public perceptions of fairness.
Third, military lawyers are not specially trained in death penalty voir dire. “The conventional wisdom is that most trials are won or lost in jury selection.” John H. Blume et al., Probing “Life Qualification” Through Expanded Voir Dire, 29 Hofstra L. Rev. 1209 (2001).[12] Voir dire is, without exaggeration, a matter of life and death. As the Supreme Court noted in Morgan v. Illinois, 504 U.S. 719, 729-30, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992):
part of the guarantee of a defendant’s right to an impartial jury is an adequate voir dire to identify unqualified jurors. Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate voir dire the trial judge’s responsibility to remove prospective jurors who will not be able impartially to follow the court’s instructions and evaluate the evidence cannot be fulfilled.
Id. at 729-30, 112 S.Ct. 2222 (brackets in original) (citations omitted) (citing Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (plurality opinion)). Yet no resources are provided to equip military defense counsel with the necessary skills to conduct effective voir dire in a capital case.
Lack of specialized training in death penalty voir dire is compounded by the structure of the military justice member selection process. In the instant case, the members that would comprise the panel were to be selected from a pool of twenty servieemembers. This *424 pool would be replenished only if causal challenges reduced the panel below twelve members, the statutory minimum for capital cases. Article 41, UCMJ, 10 U.S.C. § 841 (2012). Presumptively, all twenty members in the initial pool could serve on the panel if there were no peremptory or causal challenges.[13]
Cognizant of the limitations of panel selection, trial defense counsel in this case deliberately did not challenge any panel members for cause under the theory that the more people that were placed on the panel, the higher the likelihood that there would be an “ace of hearts” who would vote against the death penalty, leading counsel to structure “a voir dire with an aim to keep anyone who did not have a clear basis for a challenge for cause.” Defense counsels’ “ace of hearts” strategy has no basis in prevailing professional norms. The strategy was adopted by trial defense counsel based on a comment made in a concurring opinion in a United States Air Force Court of Criminal Appeals case. See United States v. Simoy, 46 M.J. 592, 625-26 (A.F.Ct.Crim.App.1996) (Morgan, J., concurring), aff'd in part, rev’d in part, 50 M.J. 1 (C.A.A.F.1998).[14]
Essentially, all considerations regarding the beliefs, biases, and personalities of the panel members, and the potential group dynamics that would form with particular combinations of members, were subordinate to the overarching goal of filling the panel.[15] This strategy is contrary to prevailing professional norms in civilian courts, but it may make sense in the military context where counsel receive only one peremptory challenge. R.C.M. 912(g)(1).
In civilian capital eases, by contrast, defense counsel are expected to do a searching inquiry of potential jurors to “life-qualify” a jury, meaning they should “conduct a voir dire that is broad enough to expose those prospective jurors who are unable or unwilling to follow the applicable sentencing law, ... [or] unwilling to consider mitigating evidence” in order to strike them from the panel. See ABA Guideline 10.10.2, commentary, 31 Hofstra L.Rev. at 1052-53.[16] Counsel additionally “should also develop a strategy for rehabilitating those prospective jurors who have indicated opposition to the death penalty.” Id.
It is imperative that counsel be trained to identify prospective jurors during voir dire who would automatically impose the death penalty following a murder conviction without meaningfully weighing the aggravating and mitigating evidence as they are required to do. See ABA Guideline 10.10.2.B., 31 Hofstra L.Rev. at 1049.[17] The Supreme *425 Court has recognized the importance of this function of capital voir dire. See Morgan, 504 U.S. at 735-36, 112 S.Ct. 2222 (“A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under [the] misconception” that a defendant convicted of a capital crime ought to be sentenced to death).[18]
Quite frankly, the incentives in the civilian and military systems are entirely at odds with respect to capital voir dire. The emphasis in civilian capital cases is to have counsel engage in a searching inquiry to “life-qualify” a jury. In the armed forces and the instant case, the incentive is to conduct a superficial voir dire to avoid elucidating statements that could prompt a causal challenge, in order to have the largest panel possible.[19] This does not afford accused servicemembers the most effective capital defense.
In summary, the armed forces have no guidelines regarding the qualifications, training, or performance required of capital defense counsel. Such omission leaves the standard amorphous and, significantly, deprives capital defense counsel of a standard against which to measure their performance. This opens the door to ineffective assistance of counsel claims, real or perceived. In failing to specify what quality of performance is expected, counsel are gratuitously exposed to claims of ineffective assistance of counsel. Confidence in the outcome of the trial on guilt or on sentencing may also diminish, as might confidence that the outcome will be upheld on appeal. This is neither good for the accused, counsel, the victims of an offense, the military, or the public credibility of the military justice system.
As is often said, death is different. It is different in kind. It is different in finality. Death is also different because the standard for ineffective assistance of counsel is hardest to find and pinpoint. When we apply the Strickland standard to determine what “prevailing professional norms” are in the military, do we look to the professional norms of counsel writ large? Or capital defense counsel specifically? Do we draw our standard for professional norms from military defense counsel? Or civilian? Given the lack of specific “prevailing professional norms,” we are left to evaluate counsels’ performance on the basis of this Court’s at best intermittent case law on the subject, and Supreme Court case law, which is directed towards state law and habeas review. This strikes me as unfair to the accused, unfair to defense counsel, and potentially unfair to the victims and their *426 families who are left in doubt about the ultimate outcome of a case until all appeals are final.
II. Trial Defense Counsel Were Ineffective in the Penalty Phase. of Appellant’s Court-Martial
“[I]ndulg[ing] a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance,” in my view, trial defense counsels’ performance during the penalty phase of Appellant’s court-martial was not “reasonable[ ] under prevailing professional norms.” Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052. As discussed further below, Appellant has identified two “acts or omissions of counsel” that were not “the result of reasonable professional judgment.” Id. at 690, 104 S.Ct. 2062. First, defense counsel submitted into evidence the entirety of Appellant’s diary, including particularly damaging passages relaying Appellant’s hatred of Caucasians and the United States, without redactions or sufficient contextualization. Second, defense counsel were deficient in the witness presentation at the penalty phase of Appellant’s court-martial by omitting any testimony that would humanize Appellant and demonstrate that his life has worth.
Counsel are ordinarily afforded great deference when making reasonable tactical decisions. Nevertheless, I conclude, as this Court concluded in Murphy, that although “[w]e have no quarrel ... regarding the obligation of an appellate court not to second-guess tactical judgments[, h]ere, ... counsels’ lack of training and experience contributed to questionable tactical judgments, leading us to the ultimate conclusion that there are no tactical decisions to 'second-guess.” Murphy, 50 M.J. at 13.
A. Appellant’s Diary
a. Admission of Appellant’s Entire Diary
During the mitigation phase of Appellant’s court-martial, defense counsel submitted into evidence the entirety of Appellant’s personal diary, dating from March 1990 to March 2003. The diary consists of 313 handwritten pages. The diary was given to the- members to take home to read without explanation and with three lines of general instruction from the military judge. Along with the diary, members also recéived notes by defense counsels’ mitigation specialist, Ms. Deborah Grey, summarizing the diary for defense counsels’ case preparation, and an FBI analysis of the diary.
In their post-appeal affidavit, counsel give two reasons supporting their decision to submit the diary in its entirety: first, their belief that “[t]he government had, in its merits case, already admitted the most damaging aspects of [Sergeant] SGT Akbar’s diary,” so no more harm could be done; and, second, that defense expert Dr. Woods believed that “SGT Akbar’s diary documented a progressive deterioration into a psychotic state,” and the diary “read in total proved SGT Akbar had mental illness.”
Under Strickland appellate courts are obliged to give heavy deference to counsel’s professional judgment because “Strickland insulates [tactical decisions] from Monday-morning quarterbacking.” Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir.2014) cert. denied sub nom. Hittson v. Chatman, — U.S. -, 135 S.Ct. 2126, 192 L.Ed.2d 887 (2015). Nevertheless, “[w]hile the point of the Sixth Amendment is not to allow Monday-morning quarterbacking of defense counsel’s strategic decisions, a lawyer cannot make a protected strategic decision without investigating the potential bases for it.” Couch v. Booker, 632 F.3d 241, 246 (6th Cir.2011). Here, counsel did not reasonably investigate the basis of their' decisions, and in the context of this case, introducing a 313-page diary without further investigation cannot be viewed as a reasonable tactical decision.
A review of the diary illustrates why expert consultation was necessary to fully and properly gauge the impact the diary would have on the panel. It also illustrates why counsels’ reasoning that the most damaging aspects of the diary had already been admitted is unreasonable. The Government admitted two diary entries, totaling less than three pages, as Prosecution Exhibit 176a. *427 The most damaging portion of the first entry, from February 2, 2003, states:
I may not have killed any Muslims but being in the Army is the same thing. I may have to make a choice very soon about who to kill. If we go to war with Iraq, ... I will have to decide if I should kill my Muslim brothers fighting for Saddam Hussein or my battle buddies.
The second entry, from February 4, 2003, contains the following remarks:
as soon as I am in Iraq I am going to try to kill as many of them as possible. If I am wrong then may Allah, The Great, stop me. I will not be able to live with myself if I go there and help these sick people kill Muslims.
Although these excerpts are damaging to Appellant’s case, they are limited temporally, and in subject matter. The entirety of the diary contains many more damaging passages.
For example, the diary is rife with references to Appellant’s hatred of Caucasians, extending back over a decade prior to the attack. In an entry from July 19, 1991, Appellant references “what the Nation of Islam taught me: to hate Caucasians ... sleep is lost thinking about the destruction of Caucasians and how to carry it out.” It is troubling that the diary also includes passages that could be interpreted to portend the crimes he committed, including an April 9, 1992, entry where Appellant writes: “I made a promise that if I was not able to achieve success because of some eaucasion [sic] I would kill as many of them as possible .... if I am denied anything given to me by almighty God, Allah, I will kill as many caca-sions [sic] as possible.” In another entry, from March 3,1996, Appellant writes:
Destroying America was my plan as a child, jovenile [sic] and freshman in college. Some where [sic] along the way it got side tracked [sic] by all of the academie problems that came my way. My life will not be complete if America is not destroyed. It is my biggest goal.
Appellant writes in his final diary entry, dated March 1, 2003, approximately three weeks before the attack, “May Allah, the Often Forgiving, forgive me for what I am about to do.”
The diary also contains passages where Appellant disparages the military, and self-identifies as “anti-government,” including a passage from January 17, 2000, where he writes: “[b]eing in the military ... is horrible to me. It is as if all of my beliefs mean nothing to me.... My feeling is that it is a betrayal of everything that a Muslim is supposed to stand for.” Appellant also references, on multiple occasions, his intent to make “jihad.” He writes in an October 2, 1999, entry: “As far as being in the Army perhaps it will be useful if there is jihad in my future.”
Appellant’s diary also related an incident where Appellant had a dispute with a sergeant:
I went to Grandpa’s Pawn Shop and bought three weapons and enough ammo to reload each of them five times. I came to work that Tuesday, we had Monday off, with all three weapons fully loaded. I had decided to just attack [the sergeant] as soon as I saw him. But he was at sick call. Right after PT formation the 1st Sgt. called me into his office. First he told me that the people at Grandpa’s called CID and said they were worried that I might be a terrorist.
None of these entries were introduced by the Government. Moreover, these passages all preceded the February 2003 entries the Government submitted into evidence.
The admission of these entries is significant for at least four reasons. First, far from showing progressive mental deterioration, the passages show a consistent thread of anti-Caucasian, anti-American, violent tendencies that extend from Appellant’s young adulthood to the time of the attack. The passages in the diary indicate that Appellant harbored antipathy towards the United States and the armed forces for years, and may have been planning an attack well in advance of March 23,2003. Specifically, with no medical context in which to place the final diary entry, it is hard to read this passage as anything other than evidence of premeditation from a depraved -man who will kill and *428 kill again if not stopped.[20] Second, they tend to support the view that Appellant’s attack was not an anomaly, but the manifestation of years of hatred directed at Caucasians, the military, and, in one instance, a fellow sergeant. Third, quite simply, these passages quell any possible sympathy the members might have garnered for Appellant based on his life story. Fourth, submitting the entire diary into evidence gave the Government additional fodder to bolster its case, which trial counsel fully exploited in closing arguments.
All of these points are illustrated with reference to the Government’s closing arguments. The Government used specific passages from the diary, on multiple occasions, to argue that Appellant deserved the death penalty. The Government argued that Appellant should be sentenced to death “to protect society from his violence and his hatred,” a short time later showing the panel slides with five passages from Appellant’s diary. Trial counsel later argued:
The defense introduced [Appellant’s] complete diary, several hundred pages-filled with repeated threats of violence and murder. When did the thoughts of violence and murder emerge? Is it only in the last four entries? Is it after the Army is being prepared to be sent into harm’s way? Was it even after 9/11? No, it’s not. These are Sergeant Akbar’s own words, dated years before he even joined the Army, back before .there was any mention of soldier talk.... Look back in his diary, look back at critical dates.
Trial counsel repeated quotations from Appellant’s diary, remarking, “Look at his diary. It is full of rage, it is full of hate, and it was all there before he was ever notified he was deploying.” What defense counsel introduced as mitigation evidence was successfully converted to powerful aggravating evidence by the Government. For these reasons, defense counsels’ judgment that the entirety of Appellant’s diary was less damaging to Appellant’s mitigation case than the two entries Government trial counsel admitted is unreasonable. It does not account for the impact of a consistent and enduring theme of hatred towards Caucasians, and, later, towards the United States armed forces. Nor was it tactically reasonable to admit the diary without explanation. This allowed members to set the context themselves, or have the Government do so in closing arguments. A reasonable investigation into the wisdom of submitting the’ entire diary might well have averted this problem.
b. Absence of Prior Investigation and Consultation Regarding the Diary
As noted above, in their post-trial affidavits, defense counsel defend them decision to submit the diary to the members without medical explanation on two related grounds. First, they argue that Dr. Woods’s assessment of the diary was that it “documented a progressive deterioration into psychotic state,” which supported their decision to offer the complete diary into evidence. Second, counsel argue that the summary created by their mitigation specialist, Ms. Deborah Grey, and the FBI’s analysis of the diary otherwise placed the diary in the intended medical context.
There are a number of problems with this explanation that undercut the decision to admit the diary. The underlying issue is that defense counsels’ decision was not supported by a reasonable investigation because they failed to seek advice before submitting the diary into evidence. First, while defense *429 counsel invoke Dr. Woods’s expertise in support of offering the diary into evidence, in actuality they did not consult with Dr. Woods before doing so. Dr. Woods states in his post-trial declaration that “[w]hile the diary is powerful evidence of schizophrenia, it is only so when viewed ... by a trained practitioner.” According to Dr. Woods, it “was a mistake” to admit the diary into evidence and he “never advised or would have advised trial defense counsel to admit the diary as they did” because, “[t]o- a lay person the diary is damning evidence, standing alone, ... and the nature of [Appellant’s diary contained explosive material.” Ms. Grey similarly opined that submitting into evidence “the diary itself without any context would be a horrible mistake from the standpoint of mitigation strategy-the diary, without context, is potentially far more damaging than mitigating.” She stated that she “would have never advised introduction of ... [Appellant’s] diary without providing context through testimony.”[21]
Second, defense counsel did not consult any experts to determine whether Ms. Grey’s notes or the FBI analysis sufficiently contextualized Appellant’s diary. Upon my review, these documents do not adequately explain these damning passages. Ms. Grey stated in a post-trial affidavit that the notes she created summarizing the diary’s contents were intended for counsels’ pretrial preparations. She cautioned that these summaries “are helpful in preparing for trial, but they are not a device intended to introduce evidence,” repeating that these notes “were not prepared for trial.” She also believed that although interview summaries might be used “[i]f for some reason a vital witness is inappropriate or unavailable to testify,” she “cannot think of an instance where [she] would recommend the introduction of an interview summary in isolation to a jury.” She stated that “presenting [her] summary of the diary ... would be a horrible mistake.”[22] Ms. Therese Scarlet Nerad, another mitigation specialist employed by defense counsel, echoed this sentiment, opining post-trial that Ms. Grey’s notes were “incomplete work produces]” and “should never have been admitted in that form” as it “would do serious disservice to a jury.”
Ms. Grey’s work product is not a polished, concise explanation of the implications of Appellant’s diary. Rather, it consists of a factual summary of Appellant’s diary — not an analysis. In some portions, it is apparent that these notes are in draft form. To illustrate, at one point, Ms. Grey writes in response to a passage, “Again, lack of problem solving ...? grandiosity?” In some instances, Ms. Grey’s notes, rather than relating how Appellant’s more hateful passages support a narrative of mental illness, merely draws attention to these passages. For example, the diary contains references to Appellant’s indoctrination in the tenets of the Nation of Islam, which defense counsel allegedly did not wish to introduce to the members. Ms. Grey’s notation next to one such passage reads: “Hatred of Caucasians— stemming from exposure to Nation of Islam,” with nothing more. Her notes point out in other places, “Childhood goal of destroying America,” and “Kill as many Caucasians as possible if they block his success in helping his people: prays Allah will stop him if he is wrong.” In short, her notes do not eommu- *430 nicate that the diary is indicative of longstanding mental illness.
The FBI analysis, similarly, fails to relate back to defense counsels’ mitigation case theme: that Appellant was mentally ill. The report does not, for example, explain that Appellant’s feelings are symptomatic of mental illness. Nor does it otherwise contextualize the damaging, anti-American, prejudicial passages in the diary. For example, the summary condenses the passages where Appellant’s entries exhibit “anger and ... increasingly verbalize[ ] a desire to kill some of his comrades,” without further analysis. Although the report’s concluding paragraphs do state that Appellant’s “diary reflects years of a lonely struggle,” they also relate that: “[a]lthough no mention is made in his diary of a specific plan to kill his military ‘buddies,’ given what has been written, his actions come as no surprise.” Significantly, the conclusion ends with this statement: “None of this excuses what Akbar has done. Based on his writings and pleas to Allah, Akbar clearly knew right from wrong. He states, T have nothing left tó lose. I don’t even have any pride left.’ ” Although the FBI assessment presents a more cohesive analysis of the diary than Ms. Grey’s notes, it still does not place damaging diary entries in the larger context of defense counsels’ theme of mental illness. Consequently, these notes did not support defense counsels’ reasoning for submitting the diary in the first place: to illustrate Appellant’s latent and emerging mental illness.
More importantly, submitting these documents along with Appellant’s entire diary does not alleviate defense counsels’ obligation to first consult with experts before admitting the diary. Defense counsel ought to have sought advice on this issue, not merely inferred that their experts would support their decision.
Defense counsel are not required to consult an expert every time they seek to submit documentary evidence. Such a standard would be absurd. They may generally rely -on their own judgment regarding the submission of exhibits. However, Strickland presents a fact- and case-specific test. See Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (noting that Strickland “of necessity requires a case-by-case examination of the evidence,” as each mitigation case is unique (quoting Wright v. West, 505 U.S. 277, 308, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992))); Rompilla v. Beard, 545 U.S. 374, 394, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (O’Connor, J., concurring) (recognizing the Supreme Court’s “longstanding ease-by-case approach to determining whether an attorney’s performance was unconstitutionally deficient under Stricklmd v. Washington.”), And this is no ordinary piece of evidence. The diary was used in support of Appellant’s lack of mental responsibility defense — a matter that is Heavily influenced by the input and advice of experts. Just as competent defense counsel are expected to consult an expert before mounting a mental illness defense,[23] so, too, should they seek expert advice before submitting critical evidence in support of such a defense.[24] Counsel here were not in a position to assume that their experts would support submission of *431 the entire diary based on general “discussions with Dr. Woods,” rather than meaningful and direct consultation. In a similar case, the United States District Court for the Eastern District of New York concluded that defense counsel was deficient for submitting into evidence “a complete, unredacted” copy of a medical report detailing a child’s account of her sexual abuse by the defendant. Usher v. Ercole, 710 F.Supp.2d 287, 305-06 (E.D.N.Y.2010). The court found that even if some of the evidence in the report was admissible, defense counsel was not “justified in placing a complete and unredaeted copy of the ... Report before the jury,” calling its contents “highly damaging,” and noting that “[t]he extraneous details in [the report] are disturbing and inflammatory.” Id. at 306-07. The court found that “[tjhese and other contextual details ... [describe a] frankly harrowing narrative of chronic abuse, with a suggestion of continuing danger.” Id. at 307. On this basis, the district court concluded that defense counsel’s decision to present the report fell below the standard of reasonable competence expected of counsel. Id. at 307-09.
Similar to Usher, here, defense counsels’ decision to present the diary to the members, unvarnished and unredacted, was not the result of a reasonable tactical decision. Not only because defense counsel failed to properly investigate the basis of their decision, but also because the decision itself was unreasonable.
The diary is problematic for two reasons. First, Appellant’s diary was a key component in the defense’s theory of Appellant’s mental illness. Second, the diary contained inflammatory entries recounting Appellant’s hatred for Caucasians, meaning it was potentially prejudicial to Appellant’s case. Cognizant of these factors, defense counsels’ lack of investigation into whether, or how, to present the diary was error.
Accordingly, trial defense counsel were deficient in deciding to submit into evidence Appellant’s entire diary without adequate investigation.
B. Omitting “Humanizing” Testimony From Appellant’s Family and Friends
a. The Importance of “Humanizing” Testimony
Although not required per se, testimony by lay mitigation witnesses humanizing an accused person is significant. In the context of a death penalty case involving a heinous offense, it may be invaluable, as well as a defendant’s best hope for life. The Supreme Court, for example, has repeatedly emphasized “the crucial importance of adducing evidence at a sentencing proceeding that establishes the defendant’s social and familial connections.” See Strickland, 466 U.S. at 718, 104 S.Ct. 2052 (Marshall, J., dissenting); see also Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (“[EJvidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable”); Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (presentation of a defendant’s life history in a capital case is “part of the process of inflicting the penalty of death” (internal quotation marks omitted)). The Court has noted that a defendant’s “troubled history ... [is] relevant to assessing a defendant’s moral culpability.” Porter v. McCollum, 558 U.S. 30, 41, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009).
The ABA Guidelines also recognize value in such testimony. Guideline 10.11 states that “it is critically important to construct a persuasive narrative in support of the case for life, rather than to simply present a catalog of seemingly unrelated mitigating factors.” ABA Guideline 10.11, commentary, 31 Hofstra L.Rev. at 1061. To that end, the ABA Guidelines encourage counsel to consider presenting, in the penalty phase of the court-martial, “[witnesses familiar with and evidence relating to the client’s life and development, from conception to the time of sentencing, that ... would present positive *432 aspects of the client’s life, or would otherwise support a sentence less than death,” as well as “witnesses who can testify about the adverse impact of the client’s execution on the client’s family and loved ones.” Id. at 1055-56. This is so because “[flamily members and friends can provide vivid first-hand accounts of the poverty and abuse that characterizes the lives of many capital defendants. These witnesses can also humanize the client by allowing the jury to see him in the context of his family, showing that they care about him, and providing examples of his capacity to behave in a caring, positive way, such as attempting to protect other family members from domestic violence or trying to be a good parent and provider.” Id. at 1062.
Moreover, under the ABA Guidelines, “[a] capital defendant has an unqualified right to present any facet of his character, background, or record that might call for a sentence less than death.” ABA Guidelines, Introduction, 31 Hofstra L.Rev. at 927. “This Eighth Amendment right ... does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present, and insist on the consideration of those compassionate or mitigating factors stemming from the diverse frailties of humankind.” Id. (internal quotation marks omitted) (citation omitted).
b. The Absence of “Humanizing” Testimony in Appellant’s Mitigation Case
Counsel in this case were not oblivious to the value of such humanizing testimony. Multiple mitigation specialists employed by defense counsel emphasized the importance of mounting a detailed social history through lay witnesses in Appellant’s mitigation case.[25] Yet counsel did not call any witnesses that humanized Appellant. During the mitigation phase of the court-martial, defense counsel called two servieemembers as well as one civilian mitigation witness: Daniel Duncan, Appellant’s high school teacher.[26] However, counsel did not call any member of Appellant’s family to request that his life be spared, standing instead on a single familial declaration from Appellant’s brother.
In their joint post-trial affidavits, counsel reasoned that they did not wish to call Appellant’s family members as witnesses for fear that their testimony could open the door to the “incident of 30 March 2005” where Appellant “allegedly stabbed a military policeman in the neck with a pair of 12-inch-scissors” while in pretrial custody.[27] De *433 fense counsel explained that “[although the defense motion to preclude the government from referencing the incident during the case was successful, it was a ruling that was made without prejudice for the government to revisit the decision at a later date.” Defense counsel stated that after the alleged attack they “re-interviewed each of [their] civilian mitigation witnesses” and chose not to call any of them because of the “inability of the witnesses] to limit their testimony in order to avoid opening the door to the SO March 2005 incident on rebuttal.”[28] (JA 2350).
Certainly, as a general matter, defense counsel have discretion on whether or not to call witnesses to testify. That is not the issue. The real issue is that counsels’ reasoning was decided on the basis of insufficient inquiry. “[A] reviewing court must consider the reasonableness of the investigation said to support that strategy.” Wiggins v. Smith, 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing Strickland, 466 U.S. at 691, 104 S.Ct. 2052). Having reviewed counsels’ strategy, it is apparent that, similar to the decision to submit Appellant’s diary, counsels’ decision was not sufficiently supported by an adequate investigation, and therefore is not entitled to deference.
We can infer that counsel valued humanizing testimony because defense counsel intended to call Appellant’s family members to testify on his behalf during the mitigation phase of Appellant’s court-martial.[29] Defense counsels’ witness list for the sentencing phase of the court-martial included Appellant’s high school classmate, Regina Weatherford; Appellant’s brother, Musa John Akbar; and Appellant’s parents, Quran Bilal and John Akbar. Indeed, up until the night before closing arguments were scheduled, MAJ Coombs implied that he would be calling one or more of these mitigation witnesses. When the military judge asked MAJ Coombs: “just to get a handle on what we might expect tomorrow; two — maybe three witnesses, so the defense sentencing case should close by 1000?,” MAJ Coombs responded, “I would think so, sir. Yes.” Yet, the next day, defense counsel called no additional witnesses, and that morning the *434 parties delivered their closing arguments.[30] Defense counsels’ actions demonstrate that despite the complication the alleged scissor' attack posed, they nevertheless planned on calling civilian mitigation witnesses for almost four weeks following the incident.
After the alleged attack, counsel had almost a month to, either, prepare their mitigation witnesses to avoid testimony that would “open the door” to the attack, or interview replacement witnesses. It appears that counsel did neither. Rather, counsel stayed the course, representing that they would call Appellant’s family as mitigation witnesses until the eleventh hour, even though defense counsel now claim, post-trial, that they did not wish to call these witnesses at all after the alleged scissor attack had occurred.[31]
More importantly, despite anticipating the limitations of their current mitigation witnesses, defense counsel did not seek out replacement witnesses. Upon determining that several mitigation witnesses scheduled to testify would prove problematic, the reasonable next step would have been for defense counsel to interview additional potential witnesses beyond Appellant’s mother, father, brother, and childhood friend. There were other family members known to defense counsel who would have been willing to testify on Appellant’s behalf: Appellant’s sisters Sultana Bilal, and Mashiyat Akbar; Appellant’s aunt, Dyan Rankins; Appellant’s cousins, Starr Wilson, Merthine Vines, Catherine Brown, and Jill Brown; Appellant’s high school friend, Ruthie Avina; and Appellant’s college landlord, Marianne Springer. Yet counsel did not seek out these witnesses to see if they could testify without opening the door to the alleged attack.[32]
Counsel were reasonably expected to further investigate following the alleged attack, yet did not. See Williams, 529 U.S. at 396, 120 S.Ct. 1495 (finding that counsel’s omissions “clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant’s background.” (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980))). According to the ABA Guidelines, even when tailoring a mitigation case to avoid bringing in otherwise inadmissible aggravating evidence, “[cjounsel should pursue all appropriate means ... to ensure that the defense case concerning penalty is *435 constricted as little as possible by this consideration.” ABA Guideline 10.11, 31 Hofstra L.Rev. at 1056-57. This was not a case where counsel believed that interviewing additional witnesses would be fruitless, Wiggins, 539 U.S. at 525, 123 S.Ct. 2527, “that character and psychological evidence would be of little help,” Strickland, 466 U.S. at 699, 104 S.Ct. 2052, or that all the witnesses they had investigated were more harmful than helpful to Appellant’s case, Burger v. Kemp, 483 U.S. 776, 794-95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).[33] Counsel simply did not interview any other family members or close friends to determine whether they could replace the mitigation witnesses.
Based on counsels’ lack of investigation, their omission of humanizing testimony was not a “virtually unchallengeable” decision made “after thorough investigation of law and facts relevant to plausible options.” See Strickland, 466 U.S. at 690, 104 S.Ct. 2052; Knowles v. Mirzayance, 556 U.S. 111, 126, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009). Rather, as the Wiggins Court noted, “[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel’s conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment.” Wiggins, 539 U.S. at 526, 123 S.Ct. 2527. Such a decision was unreasonable, even if “hindsight is discounted by pegging adequacy to ‘counsel’s perspective at the time’ investigative decisions are made.” Rompilla, 545 U.S. at 381, 125 S.Ct. 2456 (citing Strickland, 466 U.S. at 689, 104 S.Ct. 2052).
Defense counsels’ incomplete investigation into whether humanizing witnesses could testify without opening the door to aggravating evidence distinguishes the instant case from past Supreme Court cases with seemingly similar factual predicates.
In Bell v. Cone, 535 U.S. 685, 700, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), the Supreme Court did not hold defense counsel deficient where counsel neglected to “call[ ] other witnesses from [the defendant’s] childhood or days in the Army” out of “fear[ ] that the prosecution might elicit information about respondent’s criminal history.” Id. Nevertheless, that case is distinguishable because the defendant in Bell did not allege that counsel had conducted an incomplete investigation into the viability of calling other mitigation witnesses, as Appellant does here.[34] Id. Similarly, in Burger, 483 U.S. at 792-94, 107 S.Ct. 3114, the Supreme Court concluded that defense counsel’s decision not to call the defendant’s mother to testify was reasonable because counsel reasonably believed her testimony might raise “matters of historical fact that would have harmed his client’s chances for a life sentence.” Id. at 792. Like Bell, Burger is inapposite because the defendant did not claim that defense counsel had failed to interview additional witnesses. Id.[35]
Wong v. Belmontes, 558 U.S. 15, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009), is distinguishable on separate grounds. In that case, similar to the case at hand, defense counsel “built his mitigation strategy around the overriding need to exclude” evidence that the accused had committed a prior bad act, “tai *436 lor[ing] his mitigation case carefully to ... exclud[e]” the prejudicial evidence. Id. at 18-19, 130 S.Ct. 383. Yet, ultimately, the Supreme Court did not sanction this strategy, instead resolving the ease on Strickland ’s prejudice prong alone. Id. at 19, 130 S.Ct. 383. Significantly, the Supreme Court did not repudiate the circuit court’s conclusion that counsel’s “performance was constitutionally deficient,” even though defense counsel had mounted a lengthy mitigation case over the span of two days, “put[ting] on nine witnesses he thought could advance a case for mitigation,” and presenting detailed personal stories about the defendant’s character and life history. Id. Wong, therefore, is not an endorsement of counsel’s averred strategy in this ease of excluding mitigation witnesses to avoid mention of the March 30, 2005, attack.
Ultimately, counsel missed the forest for the trees. Out of concern that they not open the door to inquiry regarding Appellant’s assault of a guard with a pair of scissors, they chose not to offer what may have been Appellant’s best opportunity to avoid a sentence of death. How could a single member of the panel be expected to argue for mercy if Appellant’s own family was seemingly not prepared to do so? Moreover, to the extent the goal was to avoid opening the door to the scissor incident, and thus Appellant’s violent nature and propensity to commit acts of future violence, Appellant’s diary already arguably opened, closed, and sealed that door.
In summary, counsel were aware of the scissor attack for weeks, and intended to present mitigating witnesses to testify. Under such circumstances, proficient counsel would have undergone additional investigation instead of staying the course in light of changed circumstances. Consequently, counsels’ strategy is not entitled to deference because it was based on an incomplete investigation that was unreasonable under the circumstances. Given that defense counsel did not interview other witnesses, counsels’ choice to present no witnesses to humanize Appellant was not sound strategy. In the end, it is hard not to ask the question: If Appellant’s own family is not prepared to argue for his life, why should an individual member?
C. Prejudice — Is There a Reasonable Probability That At Least One Juror Would Have Struck a Different Balance ?
The second prong of Strickland addresses prejudice. 466 U.S. at 692-96, 104 S.Ct. 2052. Under this prong, Appellant is not required to show ‘“that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather ... establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter, 558 U.S. at 44, 130 S.Ct. 447 (citing Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052); see also Rompilla, 545 U.S. at 393, 125 S.Ct. 2456. When looking at deficient performance during capital sentencing, courts specifically examine whether “there is a reasonable probability that at least one juror would have struck a different balance” in sentencing. Wiggins, 539 U.S. at 537, 123 S.Ct. 2527. “In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.” Strickland, 466 U.S. at 695, 104 S.Ct. 2052. “[W]e reweigh the evidence in aggravation against the totality of available mitigating evidence.” Loving v. United States (Loving III), 68 M.J. 1, 7 (C.A.A.F.2009) (quoting Wiggins, 539 U.S. at 534, 123 S.Ct. 2527).
To be sure, counsel did present some mitigating evidence. But solely mounting a mitigation case is not enough. As the Supreme Court noted in Sears v. Upton, 561 U.S. 945, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010), “[W]e also have found deficiency and prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase.” Id. at 954-55, 130 S.Ct. 3259 (citing Williams, 529 U.S. at 398, 120 S.Ct. 1495 (remorse and cooperation with police), Rompilla, 545 U.S. at 378, 125 S.Ct. 2456 (residual doubt), Porter, 558 U.S. at 32, 130 S.Ct. 447 (intoxication)).
Contrary to the majority’s declaration that “if there ever was a case where a military court-martial panel would impose the death penalty, this was it,” Akbar, 74 M.J. at 372, a *437 death sentence was not a foregone conclusion in this ease. Indeed, both the Supreme Court and this Court have found prejudice in death penalty eases even when the crimes have been abhorrent. See Rompilla, 545 U.S. at 377-80, 125 S.Ct. 2456 (concluding there was prejudice notwithstanding evidence that defendant had repeatedly stabbed the victim and set him on fire); Wiggins, 539 U.S. at 514-19, 123 S.Ct. 2527 (concluding there was prejudice despite the fact that the accused drowned a septuagenarian); Murphy, 50 M.J. at 12 (concluding there was prejudice even though the case involved “a gory and inexplicable family homicide” where the accused’s “first wife had been killed by repeated blows to the head by ... a hammer, and then drowned in her bathtub” and her two young children “had been violently killed”). The question presented is not whether Appellant is guilty, but whether he had fair opportunity, with the effective representation of counsel, to argue for life.
Here, when viewing the totality of the mitigating evidence and weighing the mitigating and aggravating factors, there is a reasonable probability that “at least one [member] would have struck a different balance.” Loving III, 68 M.J. at 7 (citing Wiggins, 539 U.S. at 537, 123 S.Ct. 2527). First, the errors in question were harmful to Appellant’s case. Second, the mitigating evidence the defense introduced did not otherwise compensate for the introduction of the diary and absence of familial support. Third, and most importantly, the members requested an instruction on reconsideration, indicating that the sentence outcome was not inevitable or certain.
Admission of the diary in its entirety was harmful to Appellant’s case. As previously noted, there were damaging passages spanning from Appellant’s early twenties to the weeks before the attack, a decade later, which defense counsel introduced into evidence. First, the diary undercut defense counsels’ theory that the attack was due to Appellant’s mental illness. These passages portrayed Appellant as hateful and resentful of Caucasians and the U.S. government. They demonstrated that this hatred was enduring. This does not suggest a recent worsening of an existing mental illness that drove Appellant to attack his fellow soldiers. Second, the diary undercut the argument that the attack was not premeditated. As the FBI report states, when reading the diary, Appellant’s “actions [came] as no surprise.” Third, the diary sapped any sympathy the members may have had for Appellant.
Similarly, the absence of live lay witnesses to humanize Appellant was prejudicial. As noted, Supreme Court caée law and the ABA Guidelines recognize the value of presenting humanizing witness testimony. See Penry, 492 U.S. at 319, 109 S.Ct. 2934; Eddings, 455 U.S. at 112, 102 S.Ct. 869; Porter, 558 U.S. at 41, 130 S.Ct. 447; ABA Guideline 10.11, 31 Hofstra L.Rev. at 1061. Such testimony was completely absent in this case. The panel was left with the impression that no one could be bothered to come into court and testify on Appellant’s behalf, and that no one would be affected by his death, even his family.
Second, the witnesses that defense counsel did call to testify were unhelpful, and even harmful, to Appellant’s mitigation case. The only witnesses who testified in support of Appellant’s mitigation ease were either dispassionate expert witnesses, servicemembers who demonstrated aversion for Appellant, or civilian lay witnesses who were ambivalent about Appellant.[36]
During the merits phase of the court-martial, defense counsel called three witnesses in support of Appellant’s merits and mitigation case. Dr. Woods and Dr. Tuton testified in support of the mental illness defense. These witnesses did not know Appellant personally. Their testimony was intended to support a mental health diagnosis and was, as a result, clinical and impersonal. Dr. Woods testified from a clinician’s perspective, providing a dispassionate differential diagnosis based on his post-arrest evaluation of Appellant, and therefore did little to humanize Appellant, *438 other than point out that he likely suffers from a mental illness. Dr. Tuton had limited experience with Appellant, having conducted a mental evaluation of him when he was a teenager after speaking with Appellant for only four hours. Such testimony is no substitute for the live testimony of lay witnesses who had, at one point, a strong affinity for Appellant.
Defense counsel also called a civilian lay witness, Mr. Paul Tupaz, Appellant’s former roommate, to testify. Mr. Tupaz’s testimony, similar to that of the two experts, focused on symptoms of mental illness, such as Appellant’s habit of pacing, his short temper, and his habit of keeping lists. This testimony did not speak to any personal positive attributes of Appellant’s character, only to manifestations of a potential mental ailment.
During the mitigation phase of the trial, defense counsel called two servicemembers who had served with Appellant to testify regarding behaviors Appellant exhibited that were consistent with the theme of mental illness introduced in the merits stage of the court-martial.[37] Yet the behaviors described by these witnesses did not further establish that Appellant was psychologically ill — only that he was irresponsible and a “subpar” noncommissioned officer (NCO). For example, Captain Storch testified that Appellant had “deficiencies as a team leader,” often “exhibiting poor decision-making skills.” He testified that Appellant never improved as a platoon leader. He related an incident where Sergeant Akbar was put in charge of cleaning up a company bunker and, after doing so, dumped all the trash, including “unused M.R.E. heaters, some air conditioning units ... hazardous material[s]” into a creek, where it was eventually discovered. In addition, Sergeant Kumm testified that Appellant was a “below average” NCO and that “[i]t had been an ongoing issue that [Appellant] was not coming up to par.” The testimony presented did not support a cohesive and compelling ease for Appellant’s mental illness. This testimony illustrated that Appellant was disagreeable, and had squandered his potential.
The third witness defense counsel called during the mitigation phase was similarly unhelpful. Daniel Duncan, Appellant’s high school teacher, testified that Appellant “was an excellent student” who “ha[d] an aptitude and showed an interest” in learning. Yet he also testified that he did. not have many interactions with Appellant personally. Mr. Duncan’s unfamiliarity with Appellant and endorsement of his “aptitude” are no replacement for humanizing testimony from Appellant’s family and close friends on Appellant’s character or worth as a person.
Appellant’s mitigation case is insubstantial in contrast with the mitigation presentation in Loving III, where this Court found no prejudice. 68 M.J. at 2. In Loving III, this Court considered the fact that:
[djuring the sentencing phase, defense counsel presented the testimony of a number of witnesses to address Loving’s family and social background. These included: Joe Loving Sr., Loving’s father; Lucille Williams, Loving’s mother; Ronald Loving, Loving’s brother; Wendolyn Black, Loving’s sister; Lord Johnson, Loving’s childhood boxing coach; and Detective Verna of the Rochester police department. Stipulated testimony was submitted from Harry Loving, Loving’s brother, and Kenneth Wilson, Loving’s childhood teacher.
Id. at 9-10. Appellant’s case is lacking even when compared to United States v. Curtis (Curtis III), 46 M.J. 129, 130 (C.A.A.F.1997), where this Court did hold that the defendant was prejudiced by counsel’s deficient performance. This Court concluded that “there is a reasonable probability that there would have been a different result if all available mitigating evidence had been exploited by the defense,” 46 M.J. at 130, despite the fact that defense counsel made an “effort to present a picture of appellant not only through his mother’s own words but also through the words of over 27 individuals who knew appellant from his community in Wichita,” com *439 prising forty pages of the court-martial transcript. United States v. Curtis (Curtis II), 44 M.J. at 123, on reconsideration, 46 M.J. 129 (C.A.A.F.1997). In contrast to both Loving and Curtis, in the instant case not only were there far fewer character witnesses, but some of these witnesses painted an unflattering portrait of Appellant. It is therefore unconvincing that defense counsel presented some mitigating evidence. In weighing the aggravating and mitigating evidence, it is clear that Appellant was prejudiced by defense counsels’ decisions.
Consequently, even considering the aggravating evidence, I disagree with the majority opinion’s contention that testimony on the impact of Appellant’s death on family members would have made no difference. Akbar, 74 M.J. at 392-93. In my view, some of the mitigating evidence that defense counsel presented was arguably unhelpful, and even harmful to Appellant’s mitigation ease.
The third and critical piece to the prejudice analysis is that at least one member waivered in their decision, as evidenced by the members’ request for an opportunity to reconsider the sentence they had initially reached. This indicates that the members’ views were not fixed and could have been swayed by an effective mitigation presentation.
The members deliberated for six hours before indicating to the military judge that reconsideration had been proposed. During deliberations, any member may propose a sentence, and the members vote on a sentence by secret written ballot, starting with the least to the most severe, “until a sentence is adopted by the concurrence of the number of members required.” See R.C.M. 1006(e), (d)(2), R.C.M. 1009.[38] If a consensus is reached on a proposed sentence, the members may not vote again unless they do so under the reconsideration procedures established under R.C.M.' 1009. See R.C.M. 1006(c), (d)(2), R.C.M. 1009. Any member may propose reconsideration, but the members may only reconsider a sentence if a threshold number of members agree to do so. R.C.M. 1009. The military judge instructed the members on reconsideration after they had indicated that reconsideration had been proposed.
It is not apparent in the record what sentence the members had initially reached, namely, whether it was a death sentence, or life without parole. Indeed, the military judge instructed the members not to disclose whether the announced sentence was identical to the original vote, or had changed upon reconsideration. This detail is immaterial.[39] The request for an instruction on reconsideration itself demonstrates waiver, doubt, and room for persuasion. As this Court noted in United States v. Wilson:
[wjithout enumerating [reasons for recasting a ballot], we may state generally that they relate to the desirability of having the theories for both the prosecution and defense weighed and debated thoroughly before final judgment, for it cannot be disputed that justice is more likely to be administered if full and free discussions are not automatically cut off just because a vote has been recorded.
18 M.J. 204, 207 (C.M.A.1984). There is a reasonable probability that in weighing and debating thoroughly the evidence presented, at least one member was swayed to vote for death by the hate-filled passages in Appellant’s diary. Conversely, there is a reasonable probability that at least one member *440 would have voted for life after hearing humanizing testimony from Appellant’s family. The prejudice prong requires only a “reasonable probability that at least one juror would have struck a different balance.” Wiggins, 539 U.S. at 537, 123 S.Ct. 2527. This reconsideration request supports a reasonable probability that at least one of the members would have voted for life. This, in my view, undermines confidence in the result which, in turn, establishes prejudice. See id. at 526-27, 123 S.Ct. 2527.
Accordingly, because I would conclude that counsel was deficient and that Appellant was prejudiced by such deficient representation in the mitigation presentation, I would reverse Appellant’s sentence on the basis that he received ineffective assistance of counsel.

CONCLUSION

There is no doubt that Appellant is guilty of the offenses for which he was charged and convicted. The verdict is just. As previously stated, the question presented is whether Appellant had a fair opportunity with effective representation to argue for life. In my view, he did not.
Capital defense counsel in the military are at a disadvantage. They are expected to perform effectively in surely the most challenging and long-lasting litigation they will face in their legal careers, without the benefit of the exposure, training, guidelines, or experience in capital litigation that is available to federal civilian lawyers. We do military lawyers, and accused servicemembers, a disservice by putting them in this position.
Without the benefit of guidelines or expertise, counsel made two tactical decisions that fell below the professional norms expected of competent counsel. First, and critically, counsel introduced Appellant’s vitriolic and expansive diary without appropriate contextualization, and did so without adequate prior investigation to support this decision. Such investigation would have emphatically demonstrated a need to place the diary in medical context, particularly where it was used in support of the defense’s theme of mental illness. Without such context, the diary demonstrated that Appellant remained a threat to society and the soldiers around him.
Second, counsel failed to introduce a single witness in court to humanize Appellant and to argue for life. This was done not because counsel thought such testimony was merit-less, but to avoid opening the door to rebuttal testimony regarding Appellant’s alleged attack on a guard. Yet counsel reached this decision without first interviewing known family members to see if they could testify on Appellant’s behalf without opening the door to this aggravating evidence. Defense counsels’ decision, therefore, was not supported by reasonable investigation under the circumstances. Moreover, this water was already under the bridge. Appellant was identified as a violent offender based on overwhelming evidence of guilt. And, as the diary seemed to indicate, Appellant would offend again. Under such conditions it was not a reasonable tactical decision not to call at least one family member or friend to sincerely argue for life.
Finally, weighing the aggravating and mitigating factors, and considering that the members requested an instruction on reconsidering sentences, there is a reasonable probability that at least one juror may have been influenced by an effective presentation of mitigation evidence.
Accordingly,. I respectfully dissent and conclude that Appellant did not receive effective assistance of counsel. I would reverse Appellant’s sentence, and remand the case for a new hearing on Appellant’s sentence.

 Former Chief Judge James E. Baker took final action in this case prior to the expiration of his term on July 31,2015.

.See, e.g,, Dep't of the Army, Reg. 670-1, Uniform and Insignia, Wear and Appearance of Army Uniforms para. 3 — 2(a) (Apr. 10, 2015) [hereinafter AR 670-1],

. See, e.g., Dep’t of the Army Pam. 30-22, Food Program, Operating Procedures for the Army Food Program Table 1-1 (Feb. 6, 2007).

. See, e.g., AR 670-1, para. 20-18(c)(3)(a).

.No branch of the armed forces has adopted the ABA Guidelines as the yardstick for measuring defense counsels' performance. The Supreme Court has specifically disavowed adoption of the ABA Guidelines as definitive statements on "prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). And this Court has previously rejected arguments by counsel to adopt the ABA guidelines as the comprehensive standard of prevailing professional norms. See United States v. Loving (Loving I), 41 M.J. 213, 300 (1994), opinion modified on reconsideration, (C.A.A.F. Feb. 2, 1995), aff'd, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) (considering whether due process requires that this Court establish minimum standards for defense counsel in capital cases and concluding that specification of such standards are not constitutionally required); United States v. Murphy, 50 M.J. 4, 9 (C.A.A.F.1998) (noting that "both the ABA Guidelines and federal law are instructive,” without finding that ABA Guidelines are binding on capital military defense counsel). Nevertheless, the ABA Guidelines are helpful for determining prevailing professional norms, and have been used by both the Supreme Court and this Court for this purpose. See, e.g., Rompilla v. Beard, 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (looking to ABA Guidelines to establish appropriate standard of common practice and finding that the State "has come up with no reason to think the [applicable guideline] impertinent here"); Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (looking to Maryland professional standards and ABA Guidelines to determine the standard of reasonable professional conduct); Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct 1495, 146 L.Ed.2d 389 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)); Murphy, 50 M.J. at 9-10 (recognizing that "the ABA Guidelines and federal law are instructive"). Consequently, I also look to these standards for guidance in reviewing counsels' performance.

. Booth v. Maryland, 482 U.S. 496, 509 n. 12, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) overruled on other grounds by Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (citing Woodson v. North Carolina, 428 U.S. 280, 303-304, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion of Stewart, Powell, and Stevens, JJ.) (internal quotation marks omitted)); Loving v. United States (Loving II), 62 M.J. 235, 236 (C.A.A.F.2005) (" ‘Death is different' is a fundamental principle of Eighth Amendment law.”); Harmelin v. Michigan, 501 U.S. 957, 995, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) ("The penalty of death differs from all other forms of criminal punishment, not in degree but in kind.” (quoting Furman v. Georgia, 408 U.S. 238, 306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972))); United States v. Curtis (Curtis I), 32 MJ. 252, 255 (C.M.A.1991) (recognizing that the Supreme Court treats capital and noncapital cases differently); see also Jeffrey Abramson, Death-is-Different Jurisprudence and the Role of the Capital Jury, 2 Ohio State J.Crim. L. 117, 117 n. 1 (2004) (collecting Supreme Court concurrences authored by various justices articulating the principle that death is different).

. See Loving I, 41 M.J. at 300; Murphy, 50 M.J. at 10 (explaining that this Court will not "view[] the limited experience of counsel as inherent deficiency,” but will look solely “to the adequacy of counsel's performance”); United States v. Gray, 51 M.J. 1, 54 (C.A.A.F.1999) (declining to adopt minimum qualifications standards for capital defense counsel); see also United States v. Curtis (Curtis II), 44 M.J. 106, 126 (C.A.A.F.1996), on reconsideration, United States v. Curtis (Curtis III), 46 M.J. 129 (C.A.A.F.1997) (this Court has rejected a requirement for appointment of ABA qualified counsel twice in summary dispositions (citing United States v. Gray, 34 M.J. 164 (C.M.A.1991); Curtis v. Stumbaugh, 31 M.J. 397 (C.M.A.1990)); Loving I, 41 M.J. at 300).

. See also United States v. Curtis, 48 M.J. 330 (C.A.A.F.1997) (denial of petition for reconsideration) ("[I]n order to ensure that those few military members sentenced to death have received a fair and impartial trial within the context of the death-penalty doctrine of the Supreme Court, we *422 should expect that: ... Each military service-member has available a skilled, trained, and experienced attorney.”).

. See Dwight H. Sullivan, Killing Time: Two Decades of Military Capital Litigation, 189 Mil. L.Rev. 1, 47-48 (2006) ("The paucity of military death penalty referrals, combined with the diversity of experience that is required of a successful military attorney, leaves the military's legal corps unable to develop the skills and experience necessary to represent both sides properly.” (citing Kevin J. Barry, A Face Lift (And Much More) for an Aging Beauty: The Cox Commission Recommendations to Rejuvenate the Uniform Code of Military Justice, L.Rev. Mich. St. U.-Detroit. C.L. 57, 110 (2002))).

. The Tenth Circuit has interpreted this amendment to be a substantive change, "creating a new requirement which previously had not existed," namely, that counsel be proficient in trying capital cases, not merely proficient as lawyers writ large. United States v. McCullah, 76 F.3d 1087, 1098 (10th Cir.1996); see also In re Sterling-Suarez, 323 F.3d 1, 5-6 (1st Cir.2003) (Torruella, J., dissenting).

. See McCullah, 76 F.3d at 1098 (finding that experienced public defenders practicing for ten years were learned under the statute); In re Sterling-Suarez, 323 F.3d at 4-6 (Torruella, J., dissenting) (noting that counsel must, inter alia, have extensive prior experience litigating a capital case, and be familiar with complex death penalty procedure).

. Under the Military Commissions Act, at least one learned counsel shall be provided to the accused, even if this requires hiring civilian capital defense counsel. 10 U.S.C, § 949a(b)(2)(C)(ii) (2012).

. Citing 45 Am.Jur. Trials § 144 (1992) ("Experienced trial lawyers agree that a case can often be won or lost in voir dire."); V. Hale Starr & Mark McCormick, Jury Selection: An Attorney’s Guide to Jury Law and Methods § 3.8 (1985) ("Lawyers apparently do win, as they occasionally boast, some of their cases during, or with the help of voir dire." (quoting Hans Zeisel, The American Jury, Annual Chief Justice Earl Warren Conference on Advocacy in the United States 81-84 (1977))); Jon M. Van Dyke, Jury Selection Procedures; Our Uncertain Commitment to Representative Panels 139 (1977) ("Many attorneys believe that trials are frequently won or lost during [jury selection].”); Jeffery R. Boyll, Psychological, Cognitive, Personality and Interpersonal Factors in Jury Verdicts, 15 Law & Psychol. Rev. 163, 176 (1991) (stating that a “case may be [won] or lost at the [jury selection stage]”); Margaret Covington, Jury Selection: Innovative Approaches to Both Civil and Criminal Litigation, 16 St. Mary's L.J. 575, 575-76 (1984) (arguing that "[e]xperienced trial lawyers agree that the jury selection process is the single most important aspect of the trial proceedings. In fact, once the last person on the jury is seated, the trial is essentially won or lost.”); Chris F. Denove & Edward J. Imwinkelried, Jury Selection: An Empirical Investigation of Demographic Bias, 19 Am. J. Trial Advoc. 285, 285 (1995) ("[J]ury selection can be the most important phase of a trial. Pick the right jury and the battle is half won. But select the wrong jury, and the case is lost before [the] evidence is even heard.”). See also Williams v. Bagley, 380 F.3d 932, 978 (6th Cir.2004) (Merritt, J., dissenting) ("In such a randomized system, the capital case often is won or lost at voir dire. The voir dire and the method of jury selection become more important than the trial itself. Executions depend on "the line between innocence and guilt [which] is drawn with reference to reasonable doubt” by individual jurors” (citing Schlup v. Delo, 513 U.S. 298, 329, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995))).

. Defense counsel were only entitled to exercise one peremptory challenge per Rule for Courts-Martial (R.C.M.) 912(g)(1). By contrast in federal civilian capital cases, defense counsel are entitled to exercise twenty peremptory challenges. Fed.R.Crim.P. 24(b)(1).

. In Simoy, Judge Morgan stated in concurrence:
Little mathematical sophistication is required to appreciate the profound impact in this case of reducing the court-martial panel size. To use a simple metaphor — if appellant’s only chance to escape the death penalty comes from his being dealt the ace of hearts from a deck of 52 playing cards, would he prefer to be dealt 13 cards, or 8? ... Each challenge of an individual ‘spots’ the prosecution a vote, and becomes in essence, a vote for death.
Simoy, 46 M.J. at 625-26.

. See Dwight H. Sullivan, Playing the Numbers: Court-Martial Panel Size and the Military Death Penalty, 158 Mil. L.Rev. 1, 36 (1998) ("A defense counsel who is attempting to obtain a large panel will not engage in voir dire, with the exception of questions designed to rehabilitate any member who appears vulnerable to a challenge for cause by either the government or the defense. After all, it does the defense little good to discover that a member is biased against the accused. An accused whose primary goal is to avoid the death penalty may choose to leave biased members on the panel rather than reduce the panel size by removing them even if only a minuscule chance exists that they could overcome their bias and vote for the defense.”).

. ”[T]he starkest failures of capital voir dire are the failure to uncover jurors who will automatically impose the death penalty following a conviction or finding of the circumstances which make the defendant eligible for the death penalty, and the failure to uncover jurors who are unable to consider particular mitigating circumstances.” ABA Guideline 10.10.2, commentary, 31 Hofstra L.Rev. at 1050.

. The ABA Guidelines instruct that counsel should be familiar with techniques: (1) for exposing those prospective jurors who would auto *425 matically impose the death penalty following a murder conviction or finding that the defendant is death-eligible, regardless of the individual circumstances of the case; and (2) for uncovering those prospective jurors who are unable to give meaningful consideration to mitigating evidence. ABA Guideline 10.10.2.B., 31 Hofstra L.Rev. at 1049.

. The Morgan Court stated, in full:
A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception [that a person convicted of a death-eligible crime ought to be put to death]. The risk that such jurors may have been empaneled in this case and infected petitioner's capital sentencing [is] unacceptable in light of the ease.with which that risk could have been minimized. Petitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty.
Morgan, 504 U.S. at 735-36, 112 S.Ct. 2222 (brackets1 in original) (internal quotation marks omitted) (citations omitted).

. For example, in this case, defense counsels' strategy prompted them to include in the panel individuals who may have exhibited a bias in Appellant’s case. Defense counsel had the statutory right to have one panel member excused because he had served in the same unit as Appellant. Although the military judge brought this to defense counsels’ attention and informed them of their statutory right of removal, defense counsel demurred and kept this member on the panel. Another panel member expressed views that Muslims are “misguided, easily influenced, [and] too rigid.” On voir dire, when questioned about such views, he stated his belief that Islam is a "passionate religion” and sometimes Muslims can't "think clearly and ... take certain views that are selfish.... They interpret it the way they want to interpret certain things for their own self interests.” After perfunctory questioning, wherein the member stated that his views of Islam would not impact, his impartiality, defense counsel promptly moved to a different topic, and did not raise a causal challenge or use their lone peremptory challenge to strike this member from the panel.

. I disagree with the majority opinion's contention that premeditation was not at issue in the sentencing phase of Appellant’s court-martial as it was already proved beyond a reasonable doubt in the merits phase, Akbar, 74 M.J. at 388. In arriving at a sentence, the members were instructed that they may "consider any matter in extenuation and mitigation” and "may also consider mercy, sympathy, and sentiment in deciding ... what sentence to impose." Surely, a panel member would be less inclined to feel mercy or sympathy towards Appellant if he or she believed he had premeditated the attack over the span of months or even years, rather than in the days or hours leading up to the attack he ultimately carried out. In addition, evidence of lengthy premeditation would undercut defense counsels' theory that the attack was the result of the onset of mental illness. Consequently, the degree of premeditation Appellant exhibited is of consequence in the sentencing phase of trial, even though this element of the crime was already proved in the merits phase.

. Trial defense counsel stated in their post-trial affidavit that they recalled speaking with Ms. Grey regarding admission of documentary evidence she authored "in lieu of her live testimony” and that she did not have "any strong opinions regarding 'the wisdom of this tactic.' ” Defense counsel do not mention informing or consulting Ms. Grey on their decision to admit Appellant’s entire diary into evidence without supporting testimony. As evidenced by the post-trial affidavits, both Dr. Woods and Ms. Grey would have opposed submission of Appellant’s entire diary.

. As noted, although defense counsel state in their post-trial affidavit that Ms. Grey did not have "any strong opinions” regarding admitting documentaiy evidence, it is not clear that they consulted her specifically about presenting her interview notes with the purpose of contextualizing Appellant’s entire diary. As it appears from Ms. Grey’s uncontradicted statement that she was unaware defense counsel intended to submit the diary, she could not have realized that defense counsel intended to use her notes for this purpose. Her post-trial affidavit clarifies that she would not have endorsed use of her notes under these circumstances.

. See, e.g., Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir.2005) (determining counsel was ineffective for relying on defendant’s own testimony to support "heat of passion or diminished capacity” defense rather than ”investigat[ing], discovering], and presenting] mental health evidence").

. See Duncan v. Ornoski, 528 F.3d 1222, 1235—36 (9th Cir.2008) (noting that "[i]t is especially important for counsel to seek the advice of an expert when he has no knowledge or expertise about the field” and holding counsel’s performance deficient for failing to consult an expert before trial because counsel "did not have the personal expertise ... to make strategic decisions about how to handle ... evidence on his own and he certainly was not qualified to undermine the State’s case by simply cross-examining its experts without obtaining expert assistance himself.”); Bell v. Miller, 500 F.3d 149, 156 (2d Cir.2007) (concluding that counsel's failure to consult expert before cross-examining sole eyewitness who had suffered from "trauma, blood loss and sedation” was deficient performance under Strickland); Gersten v. Senkowski, 426 F.3d 588, 611 (2d Cir.2005) (holding that counsel was deficient for "failfing] to consult or call an expert on the psychology of child sexual abuse, or to educate himself sufficiently on the scientific issues.”).

. See Grey Declaration (mitigation specialist) ("[T]he best way to present mitigation evidence, the evidence of the client’s life history, is through lay witnesses, those individuals who may be family, friends, teachers, and treating professionals.”); Nerad Declaration (mitigation specialist) (advising, in the context of a mitigation presentation, that "it is unacceptable to substitute lay witnesses” with expert witnesses, because expert witnesses "should be used only in conjunction with lay witnesses who lay the foundation with their information.”); Rogers Declaration (mitigation specialist) ("Understanding and appreciating the relevance of Sergeant Akbar’s unusual life and extremely strange upbringing would be nearly impossible without detailed accounts and explanation” from witnesses); Dunn Declaration (experienced capital litigator) ("I instructed counsel that SGT Akbar’s story must include both the ’nature’ and ’nurture’ aspects of his life which ... provide a means of understanding his actions on the day of the crimes” and that they should present a "multigenerational life history” of Appellant).

. As explained below, Mr. Duncan’s testimony did little to humanize Appellant, in part because Mr. Duncan had only a vague recollection of Appellant as a student. And no other live witness testified to facts that would humanize Appellant. During the merits phase of the trial, defense counsel called two experts, Dr. Woods and Dr. Tuton, as well as Appellant's college roommate, Paul Tupaz. As explained further below, see infra, Part C, this testimony was clinical and dispassionate and did not humanize Appellant. Certainly, in omitting humanizing testimony from willing family members, counsel did not "at every stage of the case ... take advantage of all appropriate opportunities to argüe why death is not suitable punishment for their particular client." ABA Guideline 10.11, 31 Hofstra L.Rev. at 1058.

.Strikingly, given defense counsel’s Herculean efforts to keep out any mention of the “scissor attack” of March 30, 2005, defense counsel did not challenge any of the panel members who had stated on voir dire that they were, in some manner, aware that the attack had occurred. Out of fifteen panel members, ten stated during voir dire that they had heard of such an attack either from the local news, or from workplace chatter. Of these ten, three were never asked if they could put this incident out of their minds and decide *433 the case solely based on the evidence. Four panel members stated that they were aware from news reports that a "scuffle" had occurred involving Appellant and a military police officer. Another panel member stated he heard that Appellant had "overpowered” a guard. Yet, despite defense counsel's insistence that this incident never be mentioned during the court-martial, defense counsel did not challenge a single member who had heard of the event, not even the panel member who both expressed a slanted view of Muslims and Islam and had heard of the alleged scissor attack.

. I note that it is the majority opinion, not defense counsel, which reasons that family members’ testimony on the impact of Appellant's death would have alienated the members. Akbar, 74 M.J. at 392-93. Defense counsel did not make this claim in their post-trial affidavits. Indeed, they would not, as up until the night before closing arguments, defense counsel sought to admit the testimony of Appellant's parents as mitigating evidence. Defense counsel did not believe that testimony from family members would be fruitless or counterproductive of its own accord, only because it may open the door to the March 30, 2005 attack.

. Further proof that counsel valued humanizing testimony can be gleaned from defense counsels’ correspondences after thé merits phase of the court-martial, where counsel seemed to acknowledge the shortcomings of their mental illness defense. In an e-mail to Dr. Walker, an expert whom defense counsel had retained in preparation for trial, LTC Brookhart requested Dr. Walker’s help, explaining that ”[o]ur expert in the merits case, Dr. Woods, did ok, but obviously, the panel rejected his theory.” We can deduce from this e-mail that, mid-trial, counsel doubted the value of emphasizing the mental illness theme that Dr. Woods had developed through his differential diagnosis in the merits phase of the trial. This should have prompted a renewed focus on presenting humanizing testimony. Government appellate counsel argued in its brief before this Court that calling family members as mitigation witnesses was unnecessary because none would have contributed to defense counsels’ mental illness theme in both the merits and penalty phase of the trial. This argument is not supported by defense counsels’ post-trial affidavits, nor is it consistent with their actions at trial, wherein they appeared ready to call family members as mitigation witnesses up to the night before closing arguments. Consequently, this belief that defense counsel eschewed humanizing testimony is merely post-hoc argument that should not factor into an objective analysis of the reasonableness of defense counsels’ strategy at the time of trial.

. When questioned, MAJ Coombs informed the military judge that he had "sound tactical reasons not to” call further witnesses. Of course, this Court should not defer to counsel's own assessment that their tactical reasoning was sound; this Court must undergo this analysis objectively.

. Defense counsel did present statements in the mitigation phase of the court-martial from two potential mitigation witnesses; Appellant’s brother, Musa John Akbar, and Appellant's high school classmate Regina Weatherford. These documents were of limited value in humanizing Appellant. For example, Ms. Weatherford's statement, offered into evidence by defense counsel by way of a question-and-answer form, relates that Appellant and Ms. Weatherford were "not really” friends but "acquaintances with a love hate relationship,” and implied that Appellant was sexist, writing, "Hasan had very specific viewpoints of what a woman should or should not do. I believe it was part of his religious beliefs.” Mr. Musa John Akbar’s statement, while more personalized, was also presented in the form of a standardized question-and-answer sheet, and lacked the personal value that live witness testimony would have provided.

.Three federal circuits have recognized that counsel are not under an obligation to interview every witness who is willing to testify. See Magee v. United States, Til Fed.Appx. 598, 602 (7th Cir.2008) (unpublished) ("When counsel already knows what a potential witness is going to say and makes a strategic decision not to pursue the testimony, counsel’s performance is not defective.”); Parker v. Woodford, 168 Fed.Appx. 152, 155 (9th Cir.2006) (unpublished) ("[Cjounsel of course ... need not interview every possible witness to have performed proficiently. Interviewing witnesses whose testimony is generally known to counsel, for example, may be unnecessary.” (citing Strickland, 466 U.S. at 691, 104 S.Ct. 2052) (internal quotation marks omitted) (citations omitted)); Huffington v. Nuth, 140 F.3d 572, 580 (4th Cir.1998) ("The Sixth Amendment, however, does not always compel counsel to undertake interviews and meetings with potential witnesses where counsel is familiar with the substance of their testimony.”) (collecting cases). Nevertheless, under these circumstances, where counsel were specifically concerned about their ability to control a witness on the stand, defense counsels’ failure to interview additional witnesses beyond their original witness list was unreasonable.

. It does not appear from the post-trial affidavits that counsel concluded that no further investigation into additional humanizing witnesses was necessary following the alleged attack. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052.

. In fact, defense counsel had called the accused’s mother to testify in the merits portion of the case, but did not recall her during the sentencing case only because she "had not made a good witness at the guilt stage and should not be subjected to further cross-examination.” Bell, 535 U.S. at 687, 122 S.Ct. 1843. Defense counsel in Bell was not alleged to have made this tactical decision without a sufficient investigation.

. In Burger the accused claimed, without success, that defense counsel had failed to conduct a sufficient investigation into Appellant's background by neglecting to interview all available witnesses. Nevertheless, the basis for this claim is distinguishable from Appellant’s because in Burger the Court found that defense counsel "did interview all potential witnesses who had been called to his attention,” Burger, 483 U.S. at 794—95) 107 S.Ct. 3114, whereas in the instant case, counsel did not re-interview the mitigation witnesses known to them and could provide no reasonable justification for this omission.

. The six witnesses comprise the total number of witnesses called in support of Appellant’s mitigation case in both the merits and mitigation phases of the trial.

. The testimony of all three witnesses during Appellant's mitigation case lasted less than one hour total.

. The members are required to first vote on whether the prosecution has proved an aggravating factor beyond a reasonable doubt. R.C.M. 1004(b)(4)(A). The members must then ‘‘concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances" before they may vote on a sentence. R.C.M. 100(b)(4)(C).

. Based on the trial record, it is possible that, either, the members reached a sentence of life without parole and reconsidered with a view to increasing the sentence, or voted for death and adhered to this position on a second vote. Had the members voted on the death sentence, at least one person would need to vote for reconsideration in order to compel a second vote. This is nevertheless significant because even if one person had misgivings about a death sentence, that individual could have been persuaded by an effective mitigation case and could have precluded a sentence of death by voting for life imprisonment.